UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION



FILED
NOV 18 2016
CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CODY YELLOW, ROBERT GRINDSTONE, AND AKE KYLE EAGLE HUNTER,<br><br>Defendants. | 3:15-CR-30086-01-02-03-RAL<br><br>OPINION AND ORDER GRANTING RESTITUTION AND FOR AMENDED JUDGMENT |

This Opinion and Order resolves the remaining issues on restitution for the arson of a church.

I.   **Facts**

Defendants Cody Yellow ("Yellow"), Robert Grindstone ("Grindstone"), and Ake Kyle Eagle Hunter ("Eagle Hunter"), on July 19, 2015, were together drinking alcohol and traveling around in a car. The three traveled to a rural church on the Cheyenne River Indian Reservation near Ridgeview, South Dakota, either to use an outhouse or to visit a grave site near the church. They then broke into, set fire to, and destroyed the church. That church—known as St. Basil's Church or the Mossman Church—was built in 1917 by local residents on what is now tribal land. The church once served as a Catholic church, but in recent years had fallen into a state of partial disrepair. Community members still used the church for an occasional wedding or funeral, an annual Memorial Day service, and a meeting place.

1

The Defendants tell different stories about the extent of their involvement in the destruction of the church on July 19, 2015. Yellow and Grindstone have pleaded guilty to and been sentenced for arson and aiding and abetting, while Eagle Hunter pleaded guilty to and was sentenced as an accessory after the fact. In brief, despite the church being locked, one or more of the Defendants kicked the door open, discussed briefly burning the church down, spread an accelerant within the church, and set the church on fire. All three Defendants were at the church when the arson occurred, but they variously blamed each other for the idea and actions. The church was a total loss as a result of the arson crime.

At each of the Defendants' separate sentencing hearings, this Court left open the question of restitution under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. This Court set and held an evidentiary hearing on July 11, 2016, to hear testimony. The Government called and counsel for each of the Defendants cross-examined Michael Rousseau[1]—a descendant of tribal members who built and cared for the church and its grounds—about the history, ownership, condition, destruction, plan to replace the church, and possible costs to do so. Certain details of Rousseau's testimony and exhibits are incorporated into the discussion portion of this Opinion and Order. This Court made clear that it intended to award restitution jointly and severally among the Defendants, but wanted some additional information before determining conclusively the victim or victims to be paid and the amount. No party objected to this Court taking additional time to determine the restitution issues under the circumstances.[2]

---

[1]This Court found the testimony of Michael Rousseau to be both credible and reasonable.
[2]Defendants each are serving custody sentences of several years and are indigent. The likelihood that they would be paying any restitution soon is remote, so there was no immediate need to determine the restitution amount. Although this Court had aimed to conclude the restitution order within 90 days of sentencing under § 3664(d)(5), no Defendant objected to continuing the evidentiary hearing to August 23, 2016, and two Defendants actually sought a further postponement of the determination of restitution issues.

2

This Court then set an evidentiary hearing to take place on August 23, 2016, to hear any further evidence. On August 12, 2016, Eagle Hunter filed a Motion to Compel Defendant's Attendance at Restitution Hearing, Doc. 190, and on August 15, 2016, filed a Motion for Continuance, Doc. 191, asking for time to locate an expert to offer an alternative opinion about the cost to rebuild the church. Grindstone joined in the latter motion, but Yellow and the Government did not. Doc. 191. On August 17, 2016, Grindstone filed a separate Motion for a Continuance, Doc. 192, and a Motion to Compel Defendant's Attendance at Restitution Hearing, Doc. 193. Like Eagle Hunter had done, Grindstone asked in the motion for a continuance for time to locate an expert. Doc. 192. This Court granted Eagle Hunter and Grindstone's motions, cancelled the August 23 second restitution hearing, and in lieu of another evidentiary hearing, set deadlines for the Government and the Defendants to submit argument and by affidavits any additional information. Doc. 194.

Based on the record, this Court determined that a second evidentiary hearing on restitution issues was unnecessary. The Government had submitted a document resolving one issue, establishing that the Cheyenne River Sioux Tribe authorizes rebuilding of the church on tribal lands where it had stood for nearly 100 years, and none of the Defendants contested that information. None of the Defendants know anything about ownership of the church, plans to rebuild, or cost to rebuild. That is, none of the Defendants, including Eagle Hunter and Grindstone, are witnesses on any remaining restitution issue. Doc. 189. Those other remaining issues had been addressed in prior testimony, and all parties received an opportunity to submit any additional information through affidavits and briefing. After all, "[n]either the Due Process Clause nor the federal Sentencing Guidelines require[] the district court to hold a full-blown evidentiary hearing to decide a dispute about a proposed restitution order." United States v.

Pierre, 285 F. App'x 828, 829 (2d Cir. 2008); see also United States v. Adejumo, 777 F.3d 1017, 1020 (8th Cir. 2015) ("Sufficient information for the entry of a restitution order may be produced by witness testimony at a hearing or sworn victim statements outlining the losses which resulted from the crime."); United States v. Vandeberg, 201 F.3d 805, 813 (6th Cir. 2000) (concluding that district court has a number of options to determine proper amount of restitution including requiring additional documentation *or* testimony). This Court has allowed the Government and Defendants an opportunity to submit any affidavits (including any alternate estimate of cost to replace the church as Eagle Hunter and Grindstone contemplated) and written argument. Doc. 194. The Government submitted argument and an affidavit seeking a replacement cost of $141,459.00, which is greater than what Rousseau had discussed in his testimony. The Defendants submitted no affidavits, but made various arguments against restitution.

## II. Discussion

The MVRA governs the remaining questions on restitution. The MVRA states that a sentencing court "shall order . . . the defendant[s] [to] make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). Under the MVRA, a "victim" is "a person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2). A court is to begin the process of a restitution award by identifying the victims of the defendants' conduct. United States v. Frazier, 651 F.3d 899, 903 (8th Cir. 2011); United States v. Chalupnik, 514 F.3d 748, 752 (8th Cir. 2008). The Defendants argue variously that there is no victim because there is no owner of this allegedly abandoned church or that the "number of victims . . . would be so large as to make restitution impractical." Doc. 198 at 3. Defendants' arguments are factually mistaken.

4

First, although needing repair, the church was not abandoned. The church was used for occasional baptisms, funerals, and weddings. There was an annual Memorial Day service at the church. The church sometimes was used as a meeting spot for the community of nearby residents in this sparsely populated rural area. The bell in the bell tower of the church rang out when burials occurred in the cemetery adjacent to the church. The community had plans to repair the church, and indeed there was a $37,183.22 account balance in the church's bank account for renovation and maintenance of the church. Deposits had been made into that account in recent years, and the account had remained open from January of 1986. Doc. 182 at 27.

Second, the informal communal ownership of the church means neither that there is no victim nor that there are too many victims, and does not excuse the Defendants from a restitution obligation. Although it would be ideal if church community members had formed a 501(c)(3) not-for-profit corporation, the failure to do so is not fatal to ordering restitution. The destruction of the church "directly and proximately harmed" a number of people and indeed a church community. See 18 U.S.C. § 3663A(a)(2). The church did not have a single listed owner, but was being cared for by descendants of Basil and Mary Claymore. The Claymores had built the church in 1917, and family members had cared for the church through the years. The church was owned by descendants of the Claymore family. The church was on tribal land, and although the Cheyenne River Sioux Tribe did not itself own the church, the Tribe desires that the church be rebuilt on the land adjacent to the cemetery.[3] The Claymore family descendants established a church savings account in January of 1986, which, as mentioned earlier, had an account balance of $37,183.22. Doc. 182 at 27. Those descendants have applied for and received a grant of $25,000.00 from the Deadwood Historic Preservation Committee, which appears designated to

---

[3] Tribal members are buried in the cemetery, and descendants of the Claymore family are tribal members.

5

repairing or replacing a fence surrounding the historic cemetery and church. Doc. 182 at 25. The restitution amount should be paid to that bank account, Account Number 2908 at State Bank of Eagle Butte.

Next, the Defendants take issue with the amount of restitution. The amount of restitution "must be based on the amount of loss *actually caused* by the defendant's offense." United States v. Petruk, 484 F.3d 1035, 1036 (8th Cir. 2007) (quotation and internal quotation marks omitted). If, as here, the offense is the loss or destruction of property, the victim's actual loss equals "the greater of . . . the value of the property on the date of the damage, loss, or destruction; or . . . the value of the property on the date of sentencing." 18 U.S.C. § 3663A(b)(1)(B)(i)(I)–(II); Frazier, 651 F.3d at 904. As the Eighth Circuit has noted, this section of the MVRA instructs the court to a point in time when property should be valued, but does not "prescribe any particular method to be used in determining the 'value' of lost or damaged property." Frazier, 651 F.3d at 904. Because there is no single method to be applied in determining restitution in all circumstances, "the 'value' of lost property under the MVRA must be determined in the district court's discretion depending on the circumstances of each case." Id. The district court must be mindful of Congress's intent for restitution under the MVRA, which is "'a compensatory remedy from the victim's perspective,' and as such, restitution 'should be limited to compensation for [the victim's] *actual losses*.'" Id. (quoting Petruk, 484 F.3d at 1038). The Eighth Circuit has recognized the variety of methods available to a court under the MVRA in valuing property—fair market value, replacement cost, and foreclosure prices—but has suggested that fair market value is the most apt means to value property. Frazier, 651 F.3d at 904; see also United States vs. Boccagna, 450 F.3d 107, 114–15 (2d Cir. 2006). The Eighth Circuit, however, has acknowledged that when the actual cash value of property is difficult to ascertain because of the

uniqueness of the property or the lack of a broad and active market, then replacement cost rather than fair market value may better compensate the victim for the full amount of loss. Frazier, 651 F.3d at 904 (relying upon Boccagna, 450 F.3d at 116, and United States v. Shugart, 176 F.3d 1373, 1375 (11th Cir. 1999)). Ultimately, it is for the district court to select the appropriate valuation method based on applicable circumstances. Frazier, 651 F.3d at 904.

The Eighth Circuit in Frazier cited to an Eleventh Circuit MVRA case—United States v. Shugart, 176 F.3d 1373 (11th Cir. 1999)—which is factually analogous to this case. In Shugart, a district court used replacement value when awarding restitution for the arson of a century-old church, and calculated the restitution in an amount equal to the cost of rebuilding the church using modern construction and materials. Id. at 1374. In affirming the restitution award, the Eleventh Circuit in Shugart emphasized the importance of the church to the community and explained that a church is not a marketable commodity by which actual cash value may be derived. Id. at 1375.

Here, there is no "broad and active market" for this rural century-old church located adjacent to a cemetery. See Frazier, 651 F.3d at 904; Boccagna, 450 F.3d at 116. The community and descendants of the Claymore family plan to rebuild the church, and indeed have obtained a grant for work on the property and have some funds in an account for reconstruction of the church. Under these circumstances, replacement cost is a better measure of the victims' loss than is fair market value.

The evidentiary hearing testimony and exhibits and affidavits present this Court with conflicting information on the replacement value of the structure. Although the church was not insured, an insurance agent did a calculation of possible replacement cost. Using information from the Ziebach County Historical Society concerning this historic church, the insurance agent

7

put the size of the church at 1,248 square feet based on dimensions of 24 feet by 52 feet. Then using an estimate "to build a simple church" of $75.27 per square foot, the insurance agent calculated total replacement cost at $93,937.00. Doc. 182 at 3–4. By contrast, Robert Pearman, a Spearfish contractor familiar with the church, originally used 1,219 square feet and a replacement construction cost of $103.00 per square foot to arrive at a total replacement cost of $125,557.00. Doc. 196. Mr. Pearman subsequently realized that he missed a "bump out at northeast corner of the building" of 84 square feet, prompting him to revise his square feet estimate, this time to 1,303 square feet, and in turn change his total replacement cost to $131,609.00. Mr. Pearman then added new features, such as a handicap ramp required on new construction, wiring, and additional exterior wall insulation to arrive at a total replacement cost of $141,459.00. Doc. 196. Two of the Defendants had sought—and through this Court's cancellation of the restitution hearing received—additional time to hire their own expert, but ultimately submitted no alternative calculation of replacement cost. Mr. Rousseau provided the only testimony of contents damage, principally for the pews within the church of $2,250.00, which amount has not been contested.

Any restitution award is to "restore these victims to their original state of well-being." United States v. Statman, 604 F.3d 529, 538 (8th Cir. 2010) (quoting United States v. Balentine, 569 F.3d 801, 806 (8th Cir. 2009)). A court is not to award "'a windfall,' i.e., more in restitution than [the victims] actually lost." Boccagna, 450 F.3d at 117 (quoting United States v. Arutunoff, 1 F.3d 1112, 1121 (10th Cir. 1993); see Frazier, 651 F.3d at 904. Thus, this Court must consider the condition of the church immediately prior to the Defendants' senseless destruction of it.

The church had been in reasonably good condition until 2003, when the caretaker of the church, Michael Rousseau's father, died. Mr. Rousseau and other Claymore family descendants

continued to care for the church, but by 2015 it needed repairs. Some of the vinyl siding on the church was coming off, and there were plans to replace it with wood siding. An extension cord was used to supply electricity, as there was no electricity within the church, nor was there plumbing, heating, ventilation or air conditioning. Although the church once had a wood stove, a space heater was employed during the cold weather months for the church's use. There was an issue of snow blowing in at a spot near the altar, although the ceiling had been repaired two or three years before the fire. The Claymore descendants had plans before the fire to spend $15,000.00 to repair the church. Under these circumstances, awarding full replacement value would result in a potential windfall to the victims, if the Defendants ever were to pay such an amount of restitution.

Ultimately, the Government bears the burden of proof by a preponderance of the evidence to demonstrate the amount of loss sustained by the victims as the result of the offense. 18 U.S.C. § 3664(e); Frazier, 651 F.3d at 903. Here, the best information about the square footage is based on the actual footprint of the church used in Pearman's estimate, which is 1,303 square feet. Doc. 196. The manner in which the church was described during testimony suggests that a "simple church" construction estimate as used by an insurance agent of $75.27 per square foot more closely approximates the quality of the structure existing just prior to the arson than the $103.00 per square foot new construction cost estimated by Mr. Pearman. Thus, the Court finds that the appropriate total replacement value is $98,076.81; this total replacement value, however, reflects what would be an improvement in the structure that existed at the time the Defendants burned it down. The $98,076.81 total replacement amount must be reduced by the estimate of Michael Rousseau that $15,000.00 was needed to repair the church, which yields

a discounted replacement value of $83,076.81. Adding back the contents damage of $2,250.00, brings the appropriate restitution amount under the MVRA to $85,326.81.

Defendants then argue that whatever restitution awarded should be offset by the $25,000.00 grant from the Deadwood Historic Preservation Committee and by the amount that exists in the church's bank account at State Bank of Eagle Butte. There is utterly no reason why the amount in the church's bank account should be credited against the restitution award. The account exists to fund ongoing operations of the church and to pay for periodic repairs and improvement of the church and the surrounding 15 acres on which it sits. The account does not exist to subsidize the restitution obligation of arsonists. Likewise, it is inappropriate to reduce the restitution amount by a grant that may be coming from the Deadwood Historic Preservation Committee. The exhibit in the record indicates that the grant is for replacement of the fence at the property. Doc. 182. In addition, the information about the grant in the record comes not from the Deadwood Historic Preservation Committee, but from a land operations officer with the Bureau of Indian Affairs Realty Office in Eagle Butte. Doc. 182. There was no evidence that the $25,000.00 had been received or when the monies might be received. Even if some or all of the monies could or would go to reconstruction of the church, information in the record establishes that for new construction of such a public building, the victims face additional costs of making it handicap accessible, which is not built into this restitution award. The Defendants are not entitled to any offset of the restitution requirement due to the prospective grant.

### III. Order

For the reasons contained herein, it is hereby

ORDERED that each of the Defendants, jointly and severally, pay restitution to Account Number 2908 of the State Bank of Eagle Butte for the destruction of the church in the amount of

$85,326.81, in addition to the amounts of restitution previously ordered for fire suppression costs. It is further

ORDERED that payment of the total restitution and other criminal monetary penalties shall be due in regular quarterly installments of 50 percent of the deposits in the Defendants' inmate trust accounts while the Defendants are in custody or 10 percent of the Defendants' inmate trust accounts while serving custody at a residential reentry center. Any portion of the monetary obligations not paid in full prior to the Defendants' release from custody shall be due in monthly installments of $250.00, such payments to begin 60 days following the Defendants' release. It is further

ORDERED that the Probation and Pretrial Services Office prepare amended judgments for each of the three Defendants consistent with this Opinion and Order.

DATED this 18th day of November, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE